Good morning. May I please the court? I intend to reserve six minutes for rebuttal. My name is Jeff Pricer. I represent the appellants. Counsel, would you make sure that you keep your voice up? Yes. A noted scholar once said that truth and justice are ultimate values so understood by our people, and that the law and the legal profession will not be worthy of public respect and loyalty if we allow our attention to be diverted from these goals. Oliver Wendell Holmes said... Counsel, you're wasting your time and our time. We know this case. What are the issues? We don't need to hear from Oliver Wendell Holmes. What's the issue? I'm quoting an opinion that you wrote. I know. That's fine. But I'll ask you a question. Is there any evidence suggesting that Kurtz or Clevos knew that when they were called to the scene that Stephen Borge was the man carrying the axe? You mean knew that his name was Stephen Borge? Yes. There's no evidence. Did they know who he was? Or did they just get a call? There's no evidence in the record. They just got a call that there was a man walking down the middle of the street with an axe. Right. And that's what they say in their declaration. Did they know who it was? What do you mean who it was? I don't know what you mean. Did they know who it was? Were they told it's Stephen Borge? There's no evidence in the record of that. So as far as we know, it was an unknown person. Correct. When they were called to the scene. Correct. You know, when I go back and look at a case like this, I always take a look at the complaint. And I looked at the complaint, I thought this was a case of conspiracy to commit murder. Prior to March 20, Kurtz and Clevos discussed among themselves and others the subject of Borge and had agreed among themselves that force up to and including lethal force should and would be used against Stephen Borge in any future altercation. And then on and on with that kind of language. So I thought it was a conspiracy to commit murder case when I looked at this. That's not part of this case. Where did this where did this information come from that's in the complaint and the request for a jury trial that they were lying in wait to kill Stephen Borge? There's no evidence and there's no statement that they were lying in wait. There was another incident that occurred. I'm aware of that. Respectfully. Where is the evidence that shows that they had gotten together and were waiting for Borge in order to do something to him? I don't know why you're asking the question. You have no answer. I mean, did you make this up? I made allegations in the complaint. Did you have any evidence? Based upon a prior incident that is not part of this appeal. There was a prior incident with Mr. Borge where he was tased. I'm aware of that. But where is the evidence that there was a discussion in order to do something to Stephen Borge? There could be in the mind of the two defendants, but I'm not in their mind. Was there any evidence of this before you put it in the complaint? This was a allegation that I made. It's notice pleading and it was based upon, as I said, a prior incident that occurred with Mr. Borge where there were numerous Downey Police Department officers who had a protracted altercation with him. I'm aware of that. I read all about that. And that's what it is based on. Well, it struck me that if there was no evidence that to file a complaint like this was utterly irresponsible. And you may proceed with your argument. The complaint is completely valid in every respect. I'm the one who wrote it. Practice point or don't make false charges and complaints. We happen to read the whole record. Nothing is false in the complaint. All right. Noted. The verdict in this case must be overturned. There is no verdict. This was summary judgment. Right. But the district judge was acting as a jury because he was not following the procedures that are required in summary judgment. And where does it where's the record show that all throughout his order? He is not taking the facts in the light most favorable to the plaintiff at all. He is making numerous judicial fact finding decisions from the solitude of his chambers. For example, he claims that Mr. Boers was under the influence of drugs. There is no evidence of that, that the officers knew that. There's no. There is. There is evidence that he had. What did he have in his body? There is evidence that he had amphetamines. There is no evidence that that rose to the level of being under the influence. What did the officer say about the expression on his face when he was in front of the car? Well, after the fact, when they were preparing for summary judgment, they said indicative of drug use. But, of course, the court knows that it is also indicative of a mental or emotional trauma, which is an issue that is required to be considered by the court, which was never considered. So, counsel, what facts do you think that the district court found that were in dispute that would materially change his judgment? One of the facts that the district court found was completely unwarranted, where he says that photographs show where the body was, and then he makes several completely unsupported assumptions that because that is where the photographs show the body, that that's somehow where Mr. Bors was when he was shot. But there's no evidence to that. Was there any evidence that the body had been moved? When someone is shot ten times. Was there any evidence that the body was moved? Was there any blood elsewhere? There's evidence that when Mr. Bors was shot, there's a possibility that he stumbled forward. Was he moved by anybody? I don't know. There's no evidence of that? Right. I don't know. Is there any blood elsewhere than where he was found? I don't know if there's any evidence of that. That doesn't matter. Just because the body was lying where it was. Okay, but if you want to hypothesize that he may have stumbled after he was shot, that doesn't mean that the body was moved from where it shows in the photograph. Right, but it doesn't mean that that's where he was when he was shot. That's my point. The judge is making a determination that is not warranted. Right, but his body is not. I'm trying to figure out what the implication of that is. The district court is trying to have this fact. Tell me what theory you would have liked to have presented at trial about where he was when he was shot and how his body got to where it was. Well, if I had an expert in some field, there might be a testimony that when a person is shot ten times that their body is going to fall in a certain manner. It's going to maybe tumble or roll, etc. And you would have argued that he was farther away from the police, that he was headed over towards the curb, not going around the door at the time, and that he stumbled back in their direction? Yes, I would have attempted to present that kind of evidence, and the district court in making its decision simply… Was there anything from any of the witnesses that suggested that he had stumbled back towards the officers after he was shot? No, but there was the videotape, and the videotape shows that it was a period of 1.4 seconds from when Mr. Bors went off camera to when he was blasted with ten shots. 1.4 seconds. It was also 1.4 seconds… It would suggest what? That he wasn't very far from the car? It would suggest that a person can only walk, and no one said he ran. It would suggest that a person walks a certain distance in a certain period of time. So it's 1.4 seconds from when he walks from the center of the car off the camera, which is about half the width of the police car. There's another 1.4 second period, which is when he is shot, and that's what the video shows. So the video indicates that he didn't get very far until he was shot. Okay, and what's the problem with the evidence then? What is the mistake by the district court? Because the officers testified, and we can see from the video, which we've watched, that he comes to the center of the car staring blankly. He's not responsive to any orders from the police. He's not responsive to anything that the police are saying. Drop the axe, drop the axe, drop the axe. He then moves to the passenger side of the car. He moves out of view of the video. You tell us it's 1.4 seconds. He didn't get very far, and then he's shot. Right. He can only get so far. Right. If he didn't get very far, then it suggests that he was pretty close to the car, which was right where the officers were. So what? There was no warning of deadly force. Well, respectfully, that is not a determinative. There doesn't have to be a warning unless a warning would be appropriate or necessary. Under these circumstances, in 1.4 seconds, with them yelling police, police, and all the rest of that stuff, there's no iron bright line rule that there has to be a warning. Yes, there is. And what case does that come from? Numerous cases. Name one. And lastly, the Gonzales case in Tennessee v. Garner, which of course may not apply in this case because Tennessee v. Garner may be limited to its facts of a young, unarmed burglar. But it is clear that a warning could have been given in this case. What would the warning have been other than the warnings that were given? The warning would have been stop or we'll shoot. That would be the warning. Any warning. No warning was given in this case. And Mr. Boers was not a suspect. He was not a felony suspect. He was not a misdemeanor suspect. He wasn't suspected of anything except for maybe mental illness. Well, he terrorized somebody because that's why they called the police. The police didn't see him walking down the street. He did not. Were the police called by a citizen? He did not terrorize anyone. You answer the question if you want to or you can waste your time. What does the record show? We're going to discuss this case on the record, not on the arguments of an angry lawyer. The record shows that the 911 callers were asked if he threatened anyone and he said no. That's what the record shows. Doesn't the record show that the police were telephoned by someone who told them that a man was walking down the street in the wrong direction carrying an axe? Right. Isn't that what the record shows? And there's nothing in the record showing that he threatened or terrorized anyone. There's nothing. Zero. Nowhere. I'll let you talk. Go ahead because I don't want to communicate unless you want to communicate. I'll reserve the rest of my time. All right. Let me do so. Good morning. May it please the Court, my name is David Lawrence. I represent the Appalachians in this case. This is the type of case that Rule 56 was designed to resolve. As the District Court said, the material facts of this action are simple and concise. The video of this unfortunate and tragic event tells it all. The video shows Stephen Boers walking against traffic on a busy street carrying an axe. The officers arrive. No fewer than, I believe it's 19, statements for him to drop the axe while they have the guns pointed at him. Certainly that was sufficient warning to Mr. Boers that if he didn't drop the axe, deadly force would be used. Isn't there evidence in the case that he was walking away from the police car? No. He was walking directly at the police car. I mean after he stopped at the front of the car and he disappears from view. Isn't there evidence that says he was walking towards the curb? Well, there's evidence that he walked to his left. So he stopped directly in front of the car. There's evidence that he walked to his left. And what about the witnesses? What did the witnesses say he did then? It depends on which witness you're talking about. Well, that's exactly right. I mean there's some witnesses that said he was not walking towards the back of the car. Aren't there? Mr. Rodriguez was equivocal in his testimony. Well, what did Rodriguez say? Mr. Rodriguez said he walked to his left and then very quickly he heard shots and he saw him fall. Mr. Rodriguez also testified. Mr. Rodriguez, by the way, was driving by in a car. Mr. Rodriguez also testified. Rodriguez was on the other side of the median, is that correct? Yes. Mr. Rodriguez was on the northbound side of the road. Mr. Rodriguez testified that he continued in his car and he looked back and he could see the body under the car. I had him draw a direct line from where he was to where the body was located. Where was Mr. Boers shot? Where did the bullets enter his body? The bullets entered his body when Mr. Boers was on the passenger side. Where in the body did the bullets enter? The front of his body. The front? Well, I'm looking at gunshot wound number one and it says back to front. What does that mean? He may have twisted when the shooting was taking place. May have? But on the autopsy it says he was shot in the back. I don't have that before me, Your Honor. Well, it's ER 729. But there were multiple gunshot wounds and I'm sure they're not all back to front. Well, I mean, it would tell us something if we saw where the bullets went in, wouldn't it? I mean, if he was going towards the officer when they shot, you'd expect that he was shot in the front part of his body, right? I believe the record reflects that he was shot. Well, that's why I look at gunshot wound number one to the chin and it says back to front. What does that tell us? What that tells us is there was probably movement at the time he's being shot. Clearly, if you look at the record and see where his body landed, and that's on the excerpt of the record at page 182, his body is at the driver's side door of the police car. Have you looked at the autopsy report? I did not before this argument. No, I should have. It says on the front page autopsy report, gunshot wound number one to the chin, trajectory left to right, back to front and downward. And then there's a whole bunch of other ones front to back, front to back. But then if you turn over to page 731, it says gunshot wound number one to the chin fatal. It says trajectory front to back. Is there a mistake in the autopsy report? Front to back would be. But it says on the first page back to front and that page front to back. I did not catch that discrepancy, Your Honor. But that was really never an issue below. There was no one that testified that he was shot in the back, that he was not facing the officers when he was shot. Was the autopsy report part of the record? The autopsy report is part of the record, yes. Well, it says here back to front, front to back. It was hard for me to figure out where he was shot. I would submit to the court, Your Honor, that there is movement when these types of events occur, that there were 10 shots fired, that he is falling when those shots are fired. It may depend on which one hit him first. If he's spun, it depends on which one hits him first. That's correct. And if you look at the photograph of the body, he's on his back. You know, does it raise the problem, the number of shots fired? The number of shots fired? I don't believe so. I mean, the officers were trained to shoot to stop. He was at very close distance. He had a sharp-edged weapon, a very dangerous weapon. You can't say that we'll fire one shot and he's going to stop where he is immediately. Those officers were doing the best they could. They were firing to stop. Is there any evidence in the area that the body was moved, blood other than where the body was found? There's no such evidence. So the evidence is only that he fell pretty much where he was shot, maybe stumbled and fell? There's no evidence of stumbling. Even Mr. Rodriguez says he fell where he was shot. And Mr. Rodriguez, like I said, and if you look at the diagram, which is at the excerpt of the record at 179, I had him during the deposition draw a line from where he was to where he saw the body. And he drew that direct line and the line goes to almost exactly where the photograph of the body at Exhibit 180 or excerpt of Record 182 shows the body land. Where were the Christophers? I'm sorry? Where were the Christophers? The Christophers were behind the officers. But they were in the same direction? They were on the same side of the median? Correct. Okay. So were they closer to the officer's car than Mr. Rodriguez? I believe they were and they certainly had a better view. They had a direct line through their windshield as opposed to out of sight. They were looking from behind as opposed to across the median through the trees that were in the median. But even the testimony of Mr. Rodriguez, which appellants rely primarily upon, shows that he was shot at the area of the passenger door of the police vehicle. Is there any evidence that this was part of a conspiracy or lying in wait to shoot this man by these two officers? Absolutely not. Not a shred of evidence that these officers knew anything about Mr. Ford. Well, the complaint and the request for a jury trial is full of that. And there's nothing in the record that supports that? It's absolutely full of it. And that's why he was ultimately dismissed because there was no evidence to support it. On March 20, 2010, Kurtz and Clevos, operating an unmarked undercover vehicle and not wearing police uniforms containing noticeable insignia, were expectant of encountering and confronting Stephen Boers in order to exact retribution for the perceived slight upon the DPD penetrated by Boers, et cetera, et cetera, during which the officers inflicted injury on Boers with a deadly taser. Prior to March 20, Kurtz and Clevos had discussed among themselves and others the subject of Boers and had agreed among themselves that force up to and including lethal force should it be used against Stephen Boers in any future altercation. By March 20, Kurtz and Clevos had anticipated and planned possible scenarios that could be engendered which they would use deadly force to neutralize Stephen Boers to reclaim perceived lost honor, on and on and on, purposely placed the vehicle and accosted Boers in order to provoke him so they would appear justified in applying deadly force and possibly killing Boers. Is there anything at all about all this conspiracy talk that suggests a lying in wait, first degree premeditated murder? Absolutely not. That's irresponsible and fanciful pleading. So I think the district court's finding that reasonable force was used in this case is certainly supportive. That's not a finding. Finding is for facts. Judges do not find facts at summary judgment. They take the facts in the light most favorable to the non-moving party and they determine based on those facts whether there's any genuine issue that has to go to a jury. They don't find facts. That's a common mistake that people make. The minute they start finding facts, the other side is right. Then it should go to a jury if there's a requirement to find facts. There were no disputed issues of material fact and I think the district court says that. Well, there are a lot of disputed issues, but you say they just weren't material. They're not material and they're not really in dispute. The main one relied upon by appellant is Mr. Rodriguez, but if you look at the totality of his testimony, the totality of his testimony places the decedent at the passenger door of the police car advancing upon Officer Kurtz. It's as simple as that. And even if that were not the case, when you look at that videotape and you see Mr. Boers advancing with purpose as described by the district court and stopping at the front of the police car and holding that ax, I submit to the court that he wouldn't even have to have come around to the other side of the car to make that shooting justified. He was a threat at the front of the car and certainly when he got to the right side of the front of the car. But the evidence supports that he in fact advanced directly upon Officer Kurtz and the shooting was entirely justified, I submit. And if the shooting was reasonable, every other claim in the case falls along with that. The argument is that the police didn't say stop or we'll shoot or something. You heard what I said and I gather your response to that would be that the police did say, I think my recollection is 19 different times, drop the ax. Exactly. So is that what the record shows? Yes, 19 times with their guns trained on Mr. Boers behind a police car with its emergency lights activated. Certainly that would convey to any reasonable person that if you don't drop this deadly weapon, the consequences are going to be dire. Well, the seminal Supreme Court case, Tennessee v. Gardner, says a warning should be given, quote, where feasible, unquote. Correct. You say it's not feasible here given the time frame and everything that was going on. I'm not saying that. What I'm saying is a warning was given and that to any reasonable person, drop the ax, drop the ax with guns pointed on the person. That can be seen by the person advancing with the ax that that is a warning. I don't think the exact words stop or we will shoot and kill you have to be said. Certainly from the officer's perspective, repeatedly shouting drop the ax with guns drawn and fixed, conveyed stop or we'll shoot. That's what the court said, the district court said. I'm sorry? That's what the district court said. That the officer said? No, certainly from the officer's perspective, repeatedly shouting drop the ax with guns drawn and fixed, conveyed stop or we'll shoot. I agree. I agree. And I think if you look at the videotape, what you see is Stephen Boers when he stops at the front of that police car, takes a deep breath, and he knows what's going to happen. He's determined. He's made up his mind what's going to happen. Anything further, counsel? I have nothing further unless the court has other questions for me. Thank you, Mr. Lawrence. Thank you. Mr. Price, you have time remaining. Mr. Lawrence just conceded that under the Tennessee v. Garner scenario that it was feasible to give a warning in response to a court's question. And I would like to note that on the video, one can see Mr. Boers approaching the car. They had about 21 seconds, which the district court makes a big deal of, to warn Mr. Boers. They had guns drawn, so they could have warned him for 21 seconds. Mr. Boers was a war veteran, is that right? That is right. He was an Iraqi Freedom II veteran. Yeah. You know, what is there in 19 excited utterances by police with guns drawn that says drop the ax, drop the ax, drop the ax, that anything of saying drop the ax or we'll shoot by adding those three words, four words, would have changed here? We wouldn't be here. If they had just said or we'll shoot? That's right. If they had just said the magic words. And a reasonable person wouldn't have understood that he was in danger of being shot. He was walking the wrong way against traffic. He's not a felon. He's not a misdemeanant. He's not a suspect. No, but he's walking down the wrong way against traffic on a busy street, carrying an ax. He walks right up to the front of the police car. Which, as in the Glenn case, indicates mental illness or emotional illness. Well, that doesn't mean he's not dangerous. Well, that's another factor. Those are the kinds of people we've learned in society recently are the most dangerous. The mass shootings have all been committed by people who had severe mental problems. But it is still a consideration that the district court ignored and that needs to be considered, albeit from the solitude of one's chambers. In this case, they had the opportunity to give the warning, and he was not an immediate threat. Don't you need to argue that 19 times drop the ax with your pistol drawn is not a warning? Don't you need to tell us that? It isn't. I thought that was your position. And on what theory? Not a warning of the impending use of deadly force. It's just like Holmes says, you have to talk the facts. You don't talk words. You have to say the words. The facts are that after 19 calls, he didn't drop the ax. The 19 warnings, Your Honor, are very fast, very confusing. They're actually, both officers are actually yelling at Mr. Bors at the same time, drop the ax, drop it, drop it. Some of it is just drop it, drop it, drop it. That's all it is. Right. I'm looking at Tennessee v. Garner at the place where the court says, as previously quoted by Judge Trott, if where feasible, some warning has been given. Now, the court didn't spell out what a warning is. I mean, a warning could be, you know, police officers, drop the ax. I mean, that's a warning that there's something about to happen and that officers are present. But later cases have interpreted that, including Blandford, which was the Civil War sword case. Right, which was the main case the district court relied on. They shot Blandford in the back walking away from them. Yes, and he didn't die. He had headphones on. I mean, he was, you know, there was, Blandford is really quite different from this case. That's what I believe. I didn't, I'm not the one who relied on it. The district court did. What do you make of the autopsy report? I don't know whether it was a mistake or what. I mean, page one, it says front to back, and then you go on and you look at the more detailed description, it's back to front. Did you notice that? Yes. What does it mean? What I make of it is that the body was not just, you know, like a straight column when it was being shot. And the body was shot ten times. The hands were shot. The chest was shot. And that there was movement in the body. So perhaps the shot that went back to front from the jaw, it's talking about a jaw, a mandible injury. The head could have been turned. How much does your case depend on Mr. Rodriguez? Is he a key witness for you? It's not accurate that he is our star witness. He's just a witness who happened to be there. Ms. Loya was there too. I'm asking, who are the witnesses that you would rely on to argue to the jury that he was shot while he was walking away, for example? Mr. Rodriguez, Ms. Loya, she testified that he was walking towards the curb. I heard the court's questions to counsel earlier. Yes, there is evidence in the record that he was walking towards the curb. And give me again who those people are so I can review their testimony. Rodriguez? Rodriguez. Loya? And Gloria Loya, and her declaration is at ER 2, ER 344. That's the last page of her declaration. Yeah. She saw him move towards his left. His left also would have been to the open door on the passenger side of the police vehicle, wouldn't it? Well, the angle would have been, Kurtz would have been at 6 o'clock. The angle that he would have been walking towards would have been 3 o'clock approximately, or maybe 4 o'clock. But it is not, as the district court found, which it's not supposed to do, that he was advancing towards the officer. About 25 years ago, we had a circuit conference in Alaska, right after the trilogy came down. Anderson versus Liberty Lobby and Matsushita and the other case. And we asked Sandra Day O'Connor, what does that mean? You know, all of a sudden the Supreme Court comes down with these cases that talks about summary judgment. And what she told us and what subsequent cases say is, look, trial courts are supposed to look at the facts in the light most favorable to the non-moving party. And assume that there was a verdict in that case that depended on these facts. And if the facts would not support that verdict, and if a verdict came in based on those facts, you would get rid of the case after the jury decided it, get rid of it now. And so this is what judges tend to do. They look at the facts and they determine, is this enough to support a verdict in the plaintiff's favor? And if the judge says, no, if that's all there is and a verdict comes back, I'm going to just get rid of the verdict. That's what she told us. And it seems to me reading this, that's what the judge was doing, was looking at the facts, asking if they would support a verdict in your favor and saying no, not trying the case. I mean, the judge knows Liberty Lobby and Matsushita, we all do. The judge said, I'm just looking at the facts in the light most favorable. So this seemed to me to be what the judge was doing. These facts are not enough to support a verdict in the plaintiff's favor. I think that's what the judge was doing, but I think he slipped in a few important respects. And I think this court should overturn his ruling and send this case back to a jury. And the key slip is in what area? Where he was walking when he was shot? Where he was walking. He also says that he was under the influence of drugs, which is not in the record. He also does not address the Glenn v. Washington County case at all. He doesn't address that, which must be addressed in a circumstance like this. He also finds that Mr. Boers was an immediate threat, where what is in the record prior to the time that Mr. Boers arrives at the front of the police car is that he's walking down the middle of the street, strangely, with an ax, and people have reported that he's walking the middle of the street carrying an ax. But in the evidence of the 911 calls, it shows that people were asked, did he threaten anyone, and they said no. Well, yeah, but the issue is not yet. I mean, Holmes, when he was dressed up as Batman before he walked into the Aurora movie theater, didn't threaten anybody yet. But when he got in the movie theater, then he killed everybody he could get his sights on. And the idea is you're supposed to stop things before they turn into a threat or a danger to people. I think the officers have the opportunity to, first of all, I gather what you're leveraging your argument on is that they should have said, oh, we'll shoot. In other words, you're not denying that they dropped the ax because, well, you wouldn't pay to deny it, so you're not denying it. It's not hard to say that even Gonzales in the van was given a warning. Even he was given a warning. We've carried you well over your time, Mr. Price, and I think that we understand your argument. Thank you very much. We thank counsel for the argument. Capalvo v. Kurtz is submitted.
judges: Farris, Trott, Bybee